**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240599-U

Order filed January 15, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0599 Circuit No. 17-CF-2295 |
| JEREMY L. BOSHEARS, | ) ) ) | Honorable Jessica Colon-Sayre, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*:   The court did not err in vacating a prior pretrial release order where that order failed to make the requisite findings or by detaining defendant.

¶ 2        Defendant, Jeremy L. Boshears, appeals the Will County circuit court's order denying him pretrial release, arguing the court erred by (1) vacating the prior pretrial release order and (2) detaining him. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4         Following a jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1 (West 2016)) and concealment of a homicidal death (*id.* § 9-3.4(a)). Defendant filed a motion for a new trial, wherein he alleged various evidentiary issues and prosecutorial misconduct. The circuit court granted defendant a new trial based on cumulative error, and defendant remained in custody with his bond set at $10 million. Defendant filed a motion for review of pretrial release conditions. The State filed a petition to deny pretrial release, alleging defendant was charged with a detainable offense, he posed a real and present threat to the safety of any person, persons, or the community, and he had a high likelihood of willful flight to avoid prosecution pursuant to sections 110-6.1(a)(1.5) and 110-6.1(a)(8) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-6.1(a)(1.5), (8) (West 2022)).

¶ 5         The factual basis provided defendant and Colby O'Neal were members of the Outlaw Motorcycle Club (Outlaws). Defendant was a full-time member, while O'Neal was a probate. A probate had to serve a probationary period prior to becoming a full-time member and do anything a full-time member requested. The Outlaws had a base of operations in Joliet, Illinois, which was referred to as the Outlaws's Clubhouse (Clubhouse).

¶ 6         On November 12, 2017, defendant, O'Neal, and Kaitlyn Kearns were at Woody's bar. Surveillance footage from Woody's bar showed that defendant was wearing a white and black flannel shirt. Shortly after midnight, surveillance footage showed defendant and O'Neal left Woody's bar. They arrived at the Clubhouse a few minutes later. Defendant had invited Kearns, and she arrived approximately 45 minutes later. Cell phone records show that defendant and Kearns had begun text messaging each other on November 4, 2017, defendant was infatuated with Kearns, and he was contemplating leaving his wife for her. Defendant's search history included,

2

"I found the one[,] but I'm married" and "When is it time to leave a long-term relationship." Between November 4 and 13, 2017, defendant and Kearns exchanged 530 text messages, 330 of which were sent from defendant. Defendant told Kearns that he wanted to make her his "queen" and that she touched his "soul." Defendant text messaged Kearns, "I want you and only you."

¶ 7 While defendant, O'Neal, and Kearns were at the Clubhouse, defendant and O'Neal engaged in a verbal altercation. Defendant head-butted O'Neal, who did not retaliate because defendant was a full-time member of the Outlaws and O'Neal was a probate. O'Neal observed that defendant had a firearm. At approximately 1:45 a.m., cell phone records showed Kearns began receiving text messages of a sexual nature from an ex-boyfriend. Around 2 a.m., and shortly after the altercation, O'Neal left the Clubhouse and only defendant and Kearns remained. Kearns continued to receive text messages from her ex-boyfriend until 2:08 a.m. Around 2:16 a.m., Kearns received a phone call from her ex-boyfriend. Over the next 90 minutes, defendant made over 30 phone calls to various Outlaws members. One phone call defendant placed was to O'Neal, and defendant requested O'Neal return to the Clubhouse. Several minutes later, defendant called O'Neal again and requested they meet at a residence in Algonquin, Illinois. O'Neal arrived at the residence and defendant and Jimmy McCoy were there. McCoy was an Outlaws member and president of the Joliet chapter. O'Neal and defendant then returned to the Clubhouse.

¶ 8 When defendant and O'Neal arrived at the Clubhouse, another member, Corey Espland, arrived. Defendant and Espland entered the Clubhouse where Kearns's dead body was located. They rolled Kearns's body inside a pool table cover and placed it in the back of Kearns's vehicle. Defendant drove Kearns's vehicle to the residence of Ronald and Georgia Keagle in Kankakee, Illinois, which was approximately 50 miles from the Clubhouse. Defendant told Ronald that the vehicle would not start. Defendant appeared to be intoxicated. Defendant did not tell Ronald that

3

Kearns's dead body was inside the vehicle. Defendant, Ronald, and Georgia pushed Kearns's vehicle into a barn. Ronald then drove defendant to his residence.

¶ 9 On November 15, 2017, the police located Kearns's body in the barn. Kearns was observed to have a gunshot wound to her head. That same day, defendant and O'Neal went to various stores to purchase cleaning products and a smoke detector. They returned to the Clubhouse to clean it and placed the smoke detector over a bullet hole.

¶ 10 On November 18, 2017, the police entered the Clubhouse and observed a portion of the ceiling had been cleaned with bleach. Around the same location, a smoke detector covered a bullet hole. The police went above the ceiling and located a bullet fragment. It was determined that the fragment was discharged from a .45-caliber firearm. Inside defendant's home, the police located a .45-caliber firearm along with ammunition. Also located in defendant's residence was a black and white flannel, which was the same or similar flannel shirt defendant was wearing on November 12, 2017. A forensic analyst located gunshot residue on the flannel shirt and concluded it was in the vicinity of a discharged firearm. A forensic analyst did not locate gunshot residue on Kearns's hands and opined that her hands were not in the vicinity of a discharged firearm or gunshot residue was removed from her hands.

¶ 11 Ed Jauch, a qualified expert in the Joliet Outlaws subculture, was deputized by the federal government and tasked to infiltrate the Joliet chapter of the Outlaws. Jauch opined that the Outlaws was a "1 percenter" motorcycle club. He explained that the American Motorcycle Association made a comment that one percent of motorcyclists are bad. Jauch explained that certain motorcycle clubs, such as the Outlaws, took that as a badge of honor. He opined that if a member of the Joliet Outlaws were to contact the police, they could be killed. Jauch also explained that if members of the Outlaws did not follow bylaws, they could be physically harmed.

4

¶ 12   The State contended defendant's membership to the Outlaws and willingness to live by its bylaws demonstrated he posed a danger to the community and every witness who testified against him at trial. As to flight, the State alleged that defendant's conduct after Kearns's death was for the sole purpose to thwart the judicial process to avoid prosecution. For example, he contacted other members to conceal Kearns's death, cleaned the crime scene, drove Kearns's body approximately 50 miles away, and lied to the police.

¶ 13   A hearing was held on April 24, 2024. The parties discussed their positions at trial. Defense counsel noted Kearns's mental health history and suggested her death was caused by a self-inflicted wound. The defense's position was that defendant merely moved Kearns's body because he had to because of the Outlaws's bylaws. The State rejected this explanation and referenced a text message defendant sent to Kearns four hours after moving her body, which stated, "I hope you made it home okay." As to defendant's activity since his arrest, he was no longer a member of the Outlaws, worked for the majority of the time he had been in jail, had no disciplinary incidents, and earned various certificates.

¶ 14   The court stated it was in an ethical dilemma considering it heard the evidence presented at trial and now it was being asked if this evidence was sufficient by clear and convincing evidence. Therefore, the court provided it was "not going to tell the State that by clear and convincing evidence that [it found] that there's sufficient evidence to go forward with, A, the detention; and, B, the case itself." However, the court continued with the hearing and found, based on the information presented, defendant's lack of criminal history, and defendant's ties to the community, there were conditions that could be placed on defendant. The court granted defendant pretrial release subject to electronic monitoring and no-contact provisions. The court stayed the release

5

order for 21 days and noted the case was being reassigned to another judge due to his impending retirement.

¶ 15    The court's written order merely checked the box providing there were conditions that could mitigate the threat and risk of willful flight. The boxes providing "[d]efendant is charged with a detention-eligible offense/circumstance, but following the detention hearing, the Court denied the State's Petition to Detain for the following reasons" and "[t]he prosecution has proven by clear and convincing evidence that the following conditions of release are necessary" remained unchecked and without explanation.

¶ 16    The State filed a motion for relief, arguing the court failed to make various requisite findings, such as whether: the proof was evident or the presumption was great that defendant committed the offenses, defendant's pretrial release would pose a real and present threat to the safety of any person or persons or the community, defendant posed a danger to a specific person, and defendant posed a high likelihood of willful flight. The State also argued it presented sufficient evidence for the court to grant its petition to detain defendant.

¶ 17    A hearing was held on May 16, 2024. The court vacated the April 24, 2024, order granting defendant pretrial release, explaining the prior judge "failed to make any sort of findings regarding the first and second prong, and as a result of that there's no way for meaningful review for this Court or even for the Appellate Court." The matter proceeded to the detention hearing, and the court explained the proceeding was starting anew. The parties reiterated their positions as to whether defendant should be detained and extensively discussed the evidence presented at trial. The court took the matter under advisement.

¶ 18    The matter reconvened on May 20, 2024, and the court explained it spent several days examining the record and thoughtfully considered it. The court found the proof was evident or

presumption great that defendant committed a detainable offense, defendant posed a real and present threat to any person or persons or the community, defendant was a flight risk, and no conditions could mitigate the threat or risk of flight. The court noted the State met its burden of proof that defendant committed these offenses by clear and convincing evidence when taking into consideration all the evidence, arguments presented, and the State's factual allegations contained in the petition. The court found the same in that defendant posed a real and present threat to the safety of any person, persons, or the community. As to flight, the court found the State satisfied its burden due to the actions defendant took to conceal Kearns's death. The court believed no conditions could mitigate the threat or risk of flight, noting how extreme defendant was willing to act in not following the law (cleaning up the scene, wrapping the body, putting the body in the vehicle, traveling to another town, and leaving the body there). The court referenced defendant's final text message to Kearns that he hoped she made it home okay—"when knowing no matter where his position is regarding suicide even so knowing that she was gone and leaving that text message to thwart the judicial process." The court also noted that since the jury had already returned a guilty verdict, defendant's risk of flight was great. The court's written order indicated defendant was being detained under both the dangerousness and willful flight standards based upon the nature and circumstances of the offenses charged.

¶ 19        On September 23, 2024, defendant filed a motion for relief. Defendant argued the court erred by vacating the pretrial release order because (1) the prior judge who issued the order presided over the trial and was fully aware of the facts of the case and (2) the court's finding that conditions could mitigate the threat or likelihood of flight satisfied all findings the court was required to make. Defendant also argued the court erred when it denied him pretrial release because the State failed to prove by clear and convincing evidence that the proof was evident or

7

presumption great that defendant committed the offenses, he posed a real and present threat to any person or persons or the community or that he was a flight risk, and no conditions could mitigate the threat or likelihood of flight. The court denied the motion, and defendant appeals.

¶ 20                                    II. ANALYSIS

¶ 21        On appeal, defendant stands on his motion for relief in lieu of a memorandum. See Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). *Supra* ¶ 19. Everyone charged with an offense is eligible for pretrial release, which may only be denied in certain situations. 725 ILCS 5/110-2(a), 110-6.1 (West 2022). The State must file a verified petition requesting the denial of pretrial release. *Id.* § 110-6.1. The State then has the burden of proving by clear and convincing evidence (1) the proof is evident or presumption great that the defendant committed a detainable offense, (2) the defendant poses a real and present threat to any person, persons, or the community or is a flight risk, and (3) no conditions could mitigate this threat or risk of flight. *Id.* § 110-6.1(a), (e). The court must make a finding as to each of these three propositions. *People v. Sanchez-Segura*, 2024 IL App (3d) 240082-U, ¶ 11; *People v. Martin*, 2023 IL App (4th) 230826, ¶ 26.

¶ 22        We first address the propriety of the court's vacatur of the pretrial release order. The written order, along with the report of proceedings (*supra* ¶¶ 14-15), clearly demonstrate the court declined to make the requisite findings before granting defendant pretrial release. Therefore, the proper procedure was followed where, upon reassignment, the court vacated the order and began proceedings anew with a hearing on the State's petition to detain. See *Sanchez-Segura*, 2024 IL App (3d) 240082-U, ¶ 11. Accordingly, the court did not err in vacating the pretrial release order.

¶ 23        Next, we consider whether the court erred in granting the State's petition to detain. We consider the court's factual findings for the manifest weight of the evidence, but the ultimate decision to grant or deny the State's petition to detain is considered for an abuse of discretion.

8

*People v. Mikolaitis*, 2024 IL App (3d) 230791, ¶ 9. "Under either standard, we consider whether the court's determination is arbitrary or unreasonable." *Id.*

¶ 24     We find the court did not abuse its discretion by detaining defendant. First, the proof was evident defendant committed a detainable offense where the evidence demonstrated defendant met with Kearns at the Clubhouse, defendant had a romantic interest in Kearns, Kearns was contacted various times by an ex-boyfriend that night, defendant was seen with a firearm that night, Kearns died while at the Clubhouse as a result of a gunshot wound to her head, defendant made over 30 phone calls to various Outlaws members in this time frame, defendant wrapped Kearns's body in a pool table cover, defendant transported Kearns's body in her vehicle and left it 50 miles away, defendant cleaned the scene and placed a smoke detector over a bullet hole, the police found a bullet fragment at the scene that was of the same type of firearm and ammunition found at defendant's residence, a shirt found at defendant's residence that was similar to the one defendant was wearing had gunshot residue on it, and defendant sent a text message to Kearns approximately four hours after moving her body, stating he hoped she "made it home okay." Second, it was not against the manifest weight of the evidence for the court to find that defendant posed a danger to any person or persons and the community. Though defendant had no criminal history, the nature and circumstances of the offense, defendant's access to weapons, and having already been found guilty at trial where those involved testified against him demonstrated such danger. See 725 ILCS 5/110-6.1(g), 110-5 (West 2022); *People v. Mikolaitis*, 2024 IL 130693, ¶ 21 (providing, when determining a defendant's dangerousness and the conditions of release, the statute includes a nonexhaustive list of factors the court can consider).

¶ 25     Third, the State presented evidence that there were no conditions available to mitigate the threat defendant posed. The statute provides factors the court can consider when considering the

conditions of release, and the State presented evidence of such factors, as indicated above, including the nature and circumstances of the offense and the weight of the evidence against defendant. 725 ILCS 5/110-5 (West 2022). Accordingly, it was not against the manifest weight of the evidence for the court to find that any conditions would prevent defendant from continuing to be a threat, and we cannot say the court's decision to detain defendant was an abuse of discretion. As we found no err in detaining defendant under the dangerousness standard, we need not consider whether his detention was also proper under the willful flight standard.

¶ 26    As a final matter, we reject defendant's position that the judge who presided over his jury trial and granted him pretrial release was in a better position to make a ruling on the State's petition to detain and should be afforded more deference. First, the judge failed to make the adequate findings and then retired from the bench. The only option was for the new hearing on the State's petition to detain to be held before a different judge. Second, the judge who heard the case upon reassignment held an adequate hearing where she allowed the parties to present their positions at length and stated she extensively reviewed the record. Moreover, the judge considered the entire record and not just the factual basis provided in the State's petition to detain, which is far more than what most judges consider in initial detention hearings. We fail to see what more could be done under the facts and circumstances of this case.

¶ 27                                    III. CONCLUSION

¶ 28    The judgment of the circuit court of Will County is affirmed.

¶ 29    Affirmed.